JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Phillip D. Kline | Hon. Daniel Biles, et al. See attached list of all Defendants |
| **(b)** County of Residence of First Listed Plaintiff   Amherst County, VA  *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant  *(IN U.S. PLAINTIFF CASES ONLY)*  NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*  Richard J. Peckham, 105 E. Rhondda Avenue, Andover, KS 67002-9635 | Attorneys *(If Known)*  Unknown |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1  U.S. Government Plaintiff
- ✖ 3  Federal Question *(U.S. Government Not a Party)*
- ❏ 2  U.S. Government Defendant
- ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 400 State Reapportionment |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | Product Liability | | | ❏ 410 Antitrust |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & | ❏ 367 Health Care/ Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 430 Banks and Banking |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 450 Commerce |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 830 Patent | ❏ 460 Deportation |
| ❏ 152 Recovery of Defaulted Student Loans | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product | | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| (Excludes Veterans) | ❏ 345 Marine Product Liability | Liability | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | **PERSONAL PROPERTY** | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 370 Other Fraud | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 190 Other Contract | ❏ 360 Other Personal | ❏ 371 Truth in Lending | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 890 Other Statutory Actions |
| ❏ 195 Contract Product Liability | Injury | ❏ 380 Other Personal Property Damage | ❏ 751 Family and Medical | ❏ 864 SSID Title XVI | ❏ 891 Agricultural Acts |
| ❏ 196 Franchise | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | Leave Act | ❏ 865 RSI (405(g)) | ❏ 893 Environmental Matters |
| | | | ❏ 790 Other Labor Litigation | | ❏ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ❏ 896 Arbitration |
| ❏ 210 Land Condemnation | ✖ 440 Other Civil Rights | **Habeas Corpus:** | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 950 Constitutionality of State Statutes |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ❏ 1  Original Proceeding
- ❏ 2  Removed from State Court
- ❏ 3  Remanded from Appellate Court
- ❏ 4  Reinstated or Reopened
- ❏ 5  Transferred from Another District *(specify)*
- ❏ 6  Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §1983

Brief description of cause:
Action for declaratory/injunctive relief for due process and equal protection violations in attorney discipline case

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ❏ Yes   ✖ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE  10-18-15

SIGNATURE OF ATTORNEY OF RECORD   *Richard J. Peckham*

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## CIVIL COVER SHEET – LIST OF DEFENDANTS

HON. DANIEL BILES
SUPREME COURT OF KANSAS

HON. NANCY L. MORITZ
UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

HON. LAWTON R. NUSS
SUPREME COURT OF KANSAS

HON. CAROL A. BEIER
SUPREME COURT OF KANSAS

HON. MARLA J. LUCKERT
SUPREME COURT OF KANSAS

HON. LEE A. JOHNSON
SUPREME COURT OF KANSAS

HON. ERIC S. ROSEN
SUPREME COURT OF KANSAS

HON. CALEB STEGALL
SUPREME COURT OF KANSAS

HON. HENRY W, GREEN, JR.
KANSAS COURT OF APPEALS

HON. KAREN M. ARNOLD-BURGER
KANSAS COURT OF APPEALS

HON. EDWARD E. BOUKER
CHIEF, 23RD JUDICIAL DISTRICT

HON. BRUCE T. GATTERMAN
CHIEF, 24TH JUDICIAL DISTRICT

HON. MICHAEL J. MALONE
JUDGE, 7TH JUDICIAL DISTRICT

Continued on Next page

**Ms. CAROL GREEN**
**Clerk of Appellate Courts**

**STANTON A. HAZLETT**
**Kansas Disciplinary Administrator**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### (At Kansas City)

| | | |
|---|---|---|
| **PHILLIP D. KLINE** | : | **Case No.** _____ |
| **115 Sandidges Road** | | |
| **Amherst, Virginia 24521** | : | **Judge**_____ |
| | | |
| **Plaintiff,** | : | |
| | | |
| **vs.** | : | |
| | | |
| **HON. DANIEL BILES** | : | **COMPLAINT FOR DECLARATORY** |
| **SUPREME COURT OF KANSAS** | | **AND INJUNCTIVE RELIEF** |
| **Kansas Judicial Center** | : | |
| **301 SW 10th Avenue** | | |
| **Topeka, KA  66612-1507** | : | **(Request for Venue at Kansas City)** |
| | | |
| **HON. NANCY L. MORITZ** | : | |
| **UNITED STATES COURT OF APPEALS** | | |
| **FOR THE TENTH CIRCUIT** | : | |
| **1823 Stout Street** | | |
| **Denver, CO  80257** | : | |
| | | |
| **HON. HENRY W, GREEN, JR.** | : | |
| **KANSAS COURT OF APPEALS** | | |
| **Kansas Judicial Center** | : | |
| **301 SW 10th Avenue** | | |
| **Topeka, KA  66612-1507** | : | |
| | | |
| **HON. KAREN M. ARNOLD-BURGER** | : | |
| **KANSAS COURT OF APPEALS** | | |
| **Kansas Judicial Center** | : | |
| **301 SW 10th Avenue** | | |
| **Topeka, KA  66612-1507** | : | |
| | | |
| **HON. EDWARD E. BOUKER** | : | |
| **CHIEF, 23RD JUDICIAL DISTRICT** | | |
| **Ellis County Courthouse** | : | |
| **1204 Fort Street, P.O. Box 8** | | |
| **Hays, KA  67601** | : | |

**HON. BRUCE T. GATTERMAN**                    :
**CHIEF, 24TH JUDICIAL DISTRICT**
**Pawnee County Courthouse**                   :
**715 Broadway, P.O. Box 270**
**Larned, KA  67550-0270**                     :


**HON. MICHAEL J. MALONE**                     :
**JUDGE, 7TH JUDICIAL DISTRICT**
**111 E. 11TH Avenue**               :
**Lawrence, KA  66044-2966**


**Ms. CAROL GREEN**                            :
**Clerk of the Appellate Courts**
**Kansas Judicial Center**                     :
**301 SW 10th Avenue, Room 374**
**Topeka, Kansas 6612-1507**                   :


**STANTON A. HAZLETT**                         :
**Kansas Disciplinary Administrator**
**701 S.W. Jackson, 1st Floor**     :
**Topeka, Kansas 66603**


**HON. LAWTON R. NUSS**                        :
**SUPREME COURT OF KANSAS**
**Kansas Judicial Center**                     :
**301 SW 10th Avenue**
**Topeka, KA  66612-1507**                     :


**HON. CAROL A. BEIER**                        :
**SUPREME COURT OF KANSAS**
**Kansas Judicial Center**                     :
**301 SW 10th Avenue**
**Topeka, KA  66612-1507**                     :


**HON. MARLA J. LUCKERT**                      :
**SUPREME COURT OF KANSAS**
**Kansas Judicial Center**                     :
**301 SW 10th Avenue**
**Topeka, KA  66612-1507**                     :


**HON. LEE A. JOHNSON**                        :
**SUPREME COURT OF KANSAS**
**Kansas Judicial Center**                     :

301 SW 10th Avenue
Topeka, KA  66612-1507                    :

HON. ERIC S. ROSEN                        :
SUPREME COURT OF KANSAS
Kansas Judicial Center                    :
301 SW 10th Avenue
Topeka, KA  66612-1507                    :

HON. CALEB STEGALL                        :
SUPREME COURT OF KANSAS
Kansas Judicial Center                    :
301 SW 10th Avenue
Topeka, KA  66612-1507                    :

## INTRODUCTION

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity.  All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.  *Butz v. Ecomomou, 438 U.S. 478, 506 (1978).*

". . . no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion. *Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 814 (1986) (O'Connor, J., dissenting).*

"Does the deck seem stacked? You bet.  *Hill v. Colorado, 530 U.S. 703, 764 (2000) (Scalia, J., dissenting while discussing "whatever-it-takes proabortion jurisprudence" and the Court's "many aggressively proabortion novelties. . . .' )*

"We expect the Government to seek justice, not to fan the flames of fear and prejudice."  *Calhoun v. United States, 133 S.Ct. 1136, 1138 (2013) (Sotomayor, J., joined by Breyer, J., respecting denial of certiorari).*

3

1.    This is a civil action brought by Plaintiff Phillip D. Kline ("Mr. Kline") seeking declaratory and injunctive relief under 42 U.S.C. 1983 for constitutional violations committed against him by persons serving on, under the control of, or in the place of the Supreme Court of Kansas.    Some of the Defendants, individually and collectively, acted contrary to both the United States Constitution and the Kansas Constitution to impose an illegitimate and void suspension of Mr. Kline's Kansas law license.  By such conduct, those Defendants deprived Mr. Kline of a valuable property interest without due process of law. Some of the other Defendants, individually and collectively, have violated Mr. Kline's due process and equal protection rights in the past and, subject to the nature and extent of relief obtained in this action, pose a real and substantial risk of violating them in the future by the arbitrary application of laws, rules and procedures.  At least one of the Defendants named herein may have played no direct role in the past violations of Mr. Kline's rights but may be a necessary party for Mr. Kline to obtain the relief sought in this unprecedented case.

## JURISDICTION AND VENUE

2.   This Court has jurisdiction of this action under 28 U.S.C. §1343(a), 28 U.S.C. §2201 and 42 U.S.C. §1983.   Venue is proper in this judicial district because one or more of the Defendants reside or have their principle place of business in this judicial district, and also because the conduct that caused the constitutional violations and other injuries occurred in this judicial district.

## PARTIES

3.1    Plaintiff Phillip D. Kline is a resident of the State of Virginia and a citizen of the United States of America.

3.2    Defendant Hon. Daniel Biles is a resident of the State of Kansas and a citizen of the United States of America.  At all times relevant to this Complaint, Justice Biles has been serving as a duly appointed justice of the Kansas Supreme Court.  Defendant Biles was an active participant in the constitutional violations alleged herein and remains is a position to grant the relief sought.

3.3    Defendant Hon. Nancy L. Moritz is a resident of the State of Kansas and a citizen of the United States of America.  At all times relevant to this Complaint, Justice Moritz served as a duly appointed justice of the Kansas Supreme Court and was an active participant in the constitutional violations alleged herein.  Although Justice Moritz is now a duly appointed judge of the United States Court of Appeals for the Tenth Circuit, she is named as a Defendant in this action because she may be a necessary party for the relief sought.

3.4    Defendants Hon. Henry W. Green, Jr., and Hon. Karen M. Arnold-Burger are residents of the State of Kansas and citizens of the United States of America.  At all times relevant to this Complaint they have served as duly elected appellate court judges for the State of Kansas.  Defendants Green and Arnold-Burger were active participants in the constitutional violations alleged herein and also may be necessary parties for the relief sought.

5

3.5     Defendants Hon. Edward E. Bouker, Hon. Bruce T. Gatterman and Hon. Michael J. Malone are residents of the State of Kansas and citizens of the United States of America.  At all times relevant to this Complaint they have served as duly elected district court judges for the State of Kansas. Defendants Bouker, Gatterman and Malone were active participants in the constitutional violations alleged herein and also may be necessary parties for the relief sought.

3.6     Defendant Carol Green is a resident of the State of Kansas and a citizen of the United States of America.  At all times relevant to this Complaint, Defendant Green has served as the Clerk of the Appellate Courts for Kansas. Based on the facts reasonably known to Mr. Kline, Defendant Green was a participant, if not the moving force, behind one of the constitutional violations alleged herein and also may be a necessary party for the relief sought.  Defendant Carol Green's liability as alleged herein is limited to the Fourth Claim for Relief.

3.7     Defendant Stanton A. Hazlett is a resident of the State of Kansas and a citizen of the United States of America.  At all times relevant to this Complaint, Defendant Hazlett has served as the Disciplinary Administrator for the Supreme Court of Kansas.  Defendant Hazlett holds an office that, depending on the resolution of certain claims raised herein, places him in a position to arbitrarily and unconstitutionally impede the reinstatement of Mr. Kline's law license and/or to arbitrarily and unconstitutionally prosecute Mr. Kline for ethics violations in the future, and there is a real and substantial risk that Defendant Hazlett will do so. Defendant Hazlett's acts and omissions have also deprived Mr. Kline of equal

6

protection under the law, and continue to do so, as a result of Defendant Hazlett's arbitrary failure to hold himself, the other Defendants in this action, and other Kansas attorneys to the same disciplinary standards that he imposes on Mr. Kline.

3.8    Defendants Hon. Chief Justice Lawton Nuss, Carol A. Beier, Marla J. Luckert, Lee A. Johnson and Eric S. Rosen are residents of the State of Kansas and citizens of the United States of America.   At all times relevant to this Complaint they have served as duly appointed justices of the Kansas Supreme Court.  Although these Defendants engaged in judicial misconduct relevant to Mr. Kline's claims before they recused themselves from sitting on Kline's disciplinary case, they presumably had no direct role in the void decision purporting to suspend Mr. Kline's law license.   However, they continue to bear responsibility for attorney discipline in the State of Kansas, they are empowered to initiate disciplinary proceedings against some of their co-Defendants based on clear violations of Kansas law and procedure in the Kline case, and yet they fail to do so in violation of Mr. Kline's right to equal protection under the law. Defendants Hon. Chief Justice Lawton Nuss, Carol A. Beier, Marla J. Luckert, Lee A. Johnson and Eric S. Rosen may be necessary parties for Mr. Kline to obtain some of the relief sought.

3.9    Defendant Hon. Caleb Stegall is a resident of the State of Kansas and a citizen of the United States of America.  Justice Stegall has played no role whatsoever in the violation of Mr. Kline's rights and is named in this action only because, as a current sitting justice of the Kansas Supreme Court, he bears

responsibility for attorney discipline in the State of Kansas and may be a necessary party for Mr. Kline to obtain some of the relief sought.

## OPERATIVE FACTS
### A.  Attorney General Kline Investigates Crimes Relating to Child Sex Abuse.

4.1     Plaintiff Phillip D. Kline ("Mr. Kline") hereby incorporates paragraphs one through 3.9 as though fully restated here and further states the following.

4.2     In November 2002, the citizens of the State of Kansans elected Mr. Kline to serve as Kansas Attorney General.

4.3      After taking office in 2003, Mr. Kline began a confidential investigation into failures of medical providers to report child sexual abuse as required by Kansas law.   K.S.A. §38-1522 required medical providers to file reports with the Department of Social and Rehabilitation Services ("SRS") if they had "reason to suspect injury" to a child.   Kline's investigation allowed him to obtain records both from Kansas abortion centers and from other mandatory reporters in Kansas.

4.4     Mr. Kline's investigation soon revealed that Kansas abortion centers were failing to file mandatory sexual abuse reports with SRS.  The data obtained from SRS and from Kansas Department of Health and Environment ("KDHE") revealed that 166 abortions had been performed on children age fourteen and under, including multiple late-term abortions.  However, only four cases of sexual abuse had been reported to SRS.  A majority of the abortions performed on

children occurred at two abortion centers: Comprehensive Health Planned Parenthood of Overland Park, Kansas ("CHPP" or "Planned Parenthood") and Women's Health Care Services ("WHCS").

4.5     In August 2004, Shawnee County Judge Richard Anderson opened an inquisition and, based upon the initial evidence gathered by Kline, found probable cause that crimes had been committed and that the clinic records contained evidence of those crimes.  The crimes included child rape and illegal late-term abortions.  Judge Anderson issued inquisition subpoenas to CHPP and WHCS requesting 90 patient records of child and adult abortion patients.

4.6     At Mr. Kline's request, Judge Anderson placed the inquisition under seal and established a protocol whereby the medical records would be reviewed by court-appointed counsel and physicians for redaction of adult patient-identifying information before they were produced to Kline's office.  Kline sought the names of child patients so his office could act to protect minors who were victims of sex crimes. Kline had no interest in possessing the identities of adult patients and he could investigate and prosecute any cases of illegal late-term abortions without adult patient identities

## B.     Alpha Mandamus Action: Kansas Abortion Centers Seek Protection in Kansas Supreme Court.

4.7     CHPP and WHCS (referred to jointly as "the Centers") moved to quash the subpoenaes.  Judge Anderson denied the Centers' motions in October 2004.

4.8    The Centers then filed an original action in mandamus in the Kansas Supreme Court, later decided as *Alpha Med. Clinic v. Anderson*, 128 P.3d 364 (Kan. 2006), invoking the privacy interests of their child victims as one reason why the Centers should not be required to produce patient medical records.

4.9    On February 3, 2006, the Kansas Supreme Court issued its decision in *Alpha,* requiring the Centers to produce redacted records only if Judge Anderson concluded that Mr. Kline's theory was on "firm legal ground." Judge Anderson made that finding within months, but the lengthy redaction process prevented Kline from obtaining the records until October 24, 2006, more than two years after Judge Anderson's original subpoenae and only weeks before Kline lost his November 2006 bid for re-election. In effect, the Court delayed Mr. Kline's investigations until he could do nothing about the evidence he had obtained.

### C.    2006 Election Results: Attorney General Kline Swaps Offices with District Attorney Paul Morrison.

4.10    In November of 2006, Mr. Kline was defeated in his bid to be re-elected as Kansas Attorney General. His opponent, Johnson County District Attorney Paul Morrison, had waged a nasty and dishonest campaign fueled with pro-abortion propaganda and heavily financed with abortion money. Among other things, Morrison's campaign made false claims attacking Kline's investigation of child sex abuse, accusing Kline of being a threat to women's privacy and mishandling women's medical records. Morrison also announced, without having seen the evidence, that he would not prosecute the Centers if he won the election.

4.11   Mr. Kline was subsequently appointed by the voters of Johnson County to replace Morrison as Johnson County District Attorney, the effect being that Kline and Morrison were literally swapping offices.   Because CHPP was located in Johnson County, Kline's appointment as Johnson County District Attorney continued to hold jurisdiction to file charges against CHPP for criminal activity.   Kline therefore decided to take with him to Johnson County copies of SRS reports and redacted patient files that he had obtained through his efforts as Attorney General in order to continue his investigation. The files also contained evidence of a criminal conspiracy between CHPP and WHCS to perform illegal late-term abortion and Kline continued that investigation as Johnson County District Attorney.

4.12   Mr. Kline's attempt to effect a smooth transition in swapping offices with Morrison was met with bitter and profane hostility from Morrison, who stated his hatred of Kline and threw one of Kline's staff members out of his office.

4.13   Morrison kept an open office, allowing media full access to the office.   This and Morrison's unprofessional behavior created a logistical problem for Mr. Kline's handling of the SRS reports and patient records.   If Kline left the redacted records behind for Morrison in the Attorney General's office, Kline had no assurance they would be secure.   If Kline forwarded his own redacted copies to Johnson County before Morrison vacated that office, Kline would never see them again.   Kline therefore delivered to Judge Anderson for safe-keeping one complete set of the records for Morrison.   Kline then directed his own investigators to keep

11

control of Kline's copies for use in Johnson County.   Kline's copies were ultimately stored safely for two months in the private residence of one of his investigators before being delivered back to the District Attorney's office when the transition was complete.

### D.    CHPP v. Kline Mandamus Action:  Planned Parenthood and Attorney General Morrison Join Forces in Kansas Supreme Court in Effort to Compel District Attorney Kline to Surrender All Evidence of Planned Parenthood's Crimes.

4.14   In January 2007 Mr. Kline took office as Johnson County District Attorney affording him continued jurisdiction to investigate the crimes of CHPP and any criminal conspiracy between CHPP and WHCS.

4.15   In June 2007 Morrison publicly announced that he had completed his investigation of CHPP and did not find any evidence of criminal wrongdoing. Morrison then demanded that Judge Anderson disgorge all of the documents in his possession produced by the clinics pursuant to the court's original subpoenas. Judge Anderson was the custodian of these documents by order of the Kansas Supreme Court in the *Alpha* decision.  Judge Anderson refused Morrison's request and Morrison sued Judge Anderson in mandamus (Morrison v. Anderson) seeking a Supreme Court order that Anderson return the originally produced documents to the investigation targets.  Morrison then joined CHPP in filing another original mandamus action against Mr. Kline (*CHPP v. Kline*) in the Kansas Supreme Court, arguing that Kline should be ordered to surrender all copies of the CHPP records he had obtained as Attorney General. 4.16     In  October  2007,  while

12

*CHPP v. Kline* was pending, Johnson County Judge James Vano reviewed Kline's evidence and found probable cause to believe that CHPP had committed 107 criminal acts, including 23 felonies. Kline filed those charges on October 17, 2007.

4.16 Meanwhile, the justices of the Kanas Supreme Court were assuming an extraordinary role as Planned Parenthood's discovery agent in *CHPP v. Kline and in delaying or thwarting Kline's prosecution*. Just one week after Judge Vano made his probable cause findings, the Kansas Supreme Court ordered that a secret trial be held before an appointed magistrate (Judge King) and required Mr. Kline to testify under oath about his investigation and the evidence he had gathered. The justices also required Kline to respond to seventeen intrusive interrogatories about his investigations, with some of them requiring disclosure of information far outside the scope of CHPP's mandamus complaint and far beyond the scope of Kline's criminal investigation and prosecution. Mr. Kline objected to the breadth of the Supreme Court's discovery order, but still complied by responding accurately and completely. The Kansas Supreme Court also, ex parte, granted a motion by Mr. Morrison in Morrison v. Anderson ordering Judge Anderson to refuse to comply with any subpoena for the redacted medical records in Mr. Kline's criminal case. The Court's order effectively prevented the redacted records, already produced pursuant to the Court's *Alpha* decision, from being used in the criminal prosecution. The Court rescinded that order in 2010, after Kline was out of office.

13

4.17    On December 5, 2008, the Kansas Supreme Court issued its decision in *CHPP v. Kline*, 197 P.3d 370 (Kan. 2008).   Authored by Defendant Justice Carol A. Beier, the majority opinion was a misleading attack on Mr. Kline and made multiple accusations contrary to the fact record.  Almost lost in the fury of the Beier opinion was the Court's conclusion that there was no legal basis for compelling District Attorney Kline to surrender evidence that he had rightfully obtained while serving as Attorney General.

4.18    Notwithstanding that conclusion, the Beier opinion imposed a "sanction" against Mr. Kline based on the provably false conclusion that Kline had "left no records behind" for Attorney General Morrison and that Kline had thereby impeded Morrison from doing his job.  The "remedy" concocted by Defendant Beier and her Defendant colleagues was to require Kline to provide Morrison with copies not only of records that Morrison already had, but also of any new evidence against CHPP that Kline had acquired as Johnson County District Attorney from any source and relating to any jurisdiction. The opinion did not explain why newly acquired evidence should be given to an Attorney General who (i) did not seek or ask for it, and (ii) had already publicly stated his conclusion that CHPP had not engaged in any criminal activity.  The only practical effect of the "remedy" was to assist the target of the criminal investigation (CHPP) by allowing its political ally (Morrison) to obtain evidence relating to investigations by others in other states that was confidentially shared with Mr. Kline.  Morrison shared that evidence with the target of those investigations.

14

4.19   Aside from the ruling in Mr. Kline's favor, the fabricated sanction, and the novel remedy to assist the criminal target, the *CHPP v. Kline* opinion was most notable for its very personal attack on Kline, culminating in the statement that "a copy of this opinion will be forwarded to the disciplinary administrator." *CHPP v. Kline*, 197 P.3d at 404.  The Court thereby became a fact complainant against Kline in his future disciplinary proceeding.

4.20   Then Chief Justice McFarland, dissenting, appropriately remarked that the majority's unnecessary  "sanction" was "simply to provide a platform from which it can denigrate Kline for actions that it cannot find to have been in violation of any law and to heap scorn upon him for his attitude and behavior that does not rise to the level of contempt."  *CHPP v. Kline*, 197 P.3d at 408.  The judicial animus ascribed by Chief Justice McFarland was hardly a coincidence. For as Mr. Kline later learned and exposed in his May 2012 motion to recuse Defendant Justice Beier, she has endorsed in writing not only the principles of "third wave feminism" and its fervid support for abortion rights, but the use of media as "tools to produce cultural infrastructure, without which even the best intentioned and artfully designed legal reforms  are ineffective."  The Kansas print media obliged with scathing criticisms of Mr. Kline for things he did not do.

### E.   Mr. Kline's Role With the Johnson County Grand Jury.

4.21   Kansas law empowers citizens to circulate and qualify petitions to establish grand juries.  Under K.S.A. 38-1522, the local District Attorney serves as an advisor to the grand jury.

15

4.22   In December 2007, while Kline was serving as District Attorney, a Johnson County grand jury was convened pursuant to a citizens' petition to investigate the following seven issues relating to possible crimes of CHPP:

(i)     Performing, allowing to be performed, or colluding to perform illegal late term abortions;

(ii)    Failing to report suspected child abuse, and suspected child sexual abuse;

(iii)   Failing to follow the standard of care in providing medical advice or failure to conduct medical procedures as required by Kansas statute;

(iv)    Providing false information in order to induce government action or inaction;

(v)     Harvesting and/or illegal trafficking in fetal tissue;

(vi)    Failing to comply with parental consent requirements; and

(vii)   Failing to enforce the required 24 hour waiting period and other violations of Kansas Statutes.

4.23   By all objective appearances, the underlying purpose of the Johnson County grand jury proceeding was undermined, if not corrupted, by individuals in the position to do so.  Among the suspect developments:

- On the first day of the proceedings, Judge Kevin Moriarty appointed Stephanie Hensel, a lawyer and a nurse, to serve as Presiding Grand Juror. Hensel declared (falsely) on the record that the grand jury was uncomfortable "with Mr. Kline leading us."
- With no clear basis in the grand jury record for doing so, Judge Moriarty then appointed Kansas attorneys Larry McClain and Rick Merker to serve as special counsel to the grand jury.

16

- With no clear basis under Kansas law for doing so, and over the objection of Mr. Kline's office, Judge Moriarty allowed communications between the grand jury and its special counsel to be held off the record.
- Presiding Grand Juror Hensel was soon meeting and communicating privately with the grand jury's special counsel, and conducting independent research, to the exclusion of the other grand jurors.
- On or about January 11, 2008, after becoming dissatisfied with the guidance provided by Mr. Kline's office (due in part to her own profound ignorance of the relevant case law and Mr. Kline's view it), Presiding Grand Juror Hensel wrote privately to Special Counsel McClain that she was contemplating filing an ethics complaint against Kline.
- McClain soon gave his blessing to Hensel's desire to file her ethical complaint against Kline.
- After the grand jury issued a subpoena to CHPP on January 7, 2008, Hensel and the Grand Jury's special counsel began to placate CHPP with "negotiations" instead of demanding compliance with the subpoena.
- The "negotiations" culminated in an "agreement" between CHPP and the Grand Jury that (i) ceded to CHPP control over what records were to be produced, (ii) stipulated that any evidence produced by CHPP could not be used against it in a criminal prosecution, even though CHPP was the target of the investigation, and (iii) constituted a waiver of the absolute immunity otherwise enjoyed by grand jurors.  The "agreement" effectively exposed the grand jurors to individual civil liability for claims potentially available to CHPP if the agreement was finalized.
- There was a problem with the "agreement," however, in that it was not negotiated or approved by the Grand Jury at all, but was negotiated ex parte, away from the other grand jurors, by Hensel and Special Counsel.
- Judge Moriarty entered the so-called "agreement" into the record without the other grand jurors knowing about it or voting on it.
- After Mr. Kline's office had an opportunity to explain the effect of the "agreement" to the excluded grand jurors, the Grand Jury rejected it.
- Meanwhile, Mr. Kline and his staff were alone taking action (consistent with the very purpose of the Grand Jury and the Grand Jury's vote) to force CHPP to comply with the subpoena, which had never been withdrawn, by filing motions to compel compliance.
- As the clock ran on the grand jury's term, Judge Moriarty effectively discouraged the grand jury from demanding compliance from CHPP.

- Hensel later committed perjury while testifying against Mr. Kline in his disciplinary hearing, misrepresenting the order of certain grand jury events to portray the advice of Kline's office as harmful to grand jury's decision-making, when the grand jury record proves conclusively that it was not.

## F.   Kansas Disciplinary Proceedings Against Mr. Kline: Arbitrary and Lawless From Beginning to End.

### 1.   Kansas Supreme Court Justices Join Political Adversaries of Mr. Kline as Fact Complainants Against Kline.

4.24   Beginning in November 2006, Mr. Kline's legal and political adversaries collaborated to attack him through the Kansas disciplinary process. Attorneys for the Centers and the office of Attorney General Morrison filed complaints against Kline with the Office of the Kansas Disciplinary Administrator ("KDA").

4.25   On November 30, 2006, the Kansas Supreme Court first became a fact complainant against Mr. Kline when, acting on the Court's instructions, the Clerk of the Appellate Courts referred to the KDA documents to be investigated and considered for possible ethical violations against Mr. Kline. As noted above, the Kansas Supreme Court acted as fact complainant again by referring its own *CHPP v. Kline* opinion to the KDA on December 5, 2008.

4.26   Presiding Grand Juror Stephanie Hensel joined the attack with misleading letters of complaint on July 8 and July 31, 2008.

### 2.    The KDA and the Review Committee Violate Multiple Rules to Deprive Mr. Kline of Protections Afforded By Kansas Law.

4.27    The KDA served the complaint(s) on Kline and met with him to discuss them.  On September 19, 2007, Kline provided the KDA with a 69 page response addressing a wide range of issues.

4.28    The KDA hired Kansas attorneys S. Lucky DeFries and Mary Beth Mudrick to investigate the allegations of misconduct against Kline.  On May 21, 2008, DeFries and Mudrick issued a report ("DeFries Report") concluding there was no probable cause to proceed on the complaints against Kline.

4.29    To the great benefit of CHPP and Mr. Kline's political opponents, the KDA suppressed the DeFries Report and withheld it from Kline, thereby depriving Kline of significant public vindication from the many dishonest attacks against him and his investigation by CHPP and Morrison as the August 2008 primary election approached.  Kline only learned of the DeFries Report after it was produced by the KDA to one of Kline's former assistants in a related (and equally dubious) disciplinary proceeding relating to Kline's investigations.

4.30    Under the Kansas Rules Relating to Discipline of Attorneys, the KDA is responsible for investigating all ethics complaints.  After an investigation, the KDA is required to submit a copy of the complaint with investigative materials and a recommendation for disposition to a Review Committee. Each Review Committee member is then required to review the written material and make a recommendation for disposition.  The Committee Chair is required to record the

individual recommendations. Disposition is made by a majority vote of the Review Committee and a complaint may be referred for a panel hearing <u>only if the Review Committee finds by a majority vote that there is probable cause</u> to believe that there has been a violation of the Attorney's Oath or the Kansas Rules of Professional Conduct ("KRPC").

4.31    The Committee Chair is required to prepare a record of each action of the Review Committee and to distribute it to the Committee and to the KDA.

4.32    In total disregard or the aforementioned rules and procedures, and in total disregard of Mr. Kline's liberty and property interests that those rules and procedures are designed to protect, the KDA filed a Formal Complaint against Kline on January 14, 2010 (i) without providing the Review Committee with the written investigative materials, including the vindicating DeFries Report and King Report, (ii) without obtaining a probable cause finding from the Review Committee, and (iii) without receiving any record of the action by the Review Committee or Chair.

4.33    The Formal Complaint against Mr. Kline was a potpourri of factual allegations covering a vast array of conduct during Kline's six years as Attorney General and District Attorney, tracking in great detail the allegations in the complaints of the Centers' attorneys and either contradicting or disregarding many findings and conclusions of the King Report, the DeFries Report, and the fact record(s) previously developed. The charges against Kline evolved significantly over time at the whim of the KDA, impairing Kline's ability to prepare a defense.

20

4.34   The KDA filed an Amended Formal Complaint in late November 2010, listing 37 pages of fact allegations without linking any of the allegations to specific disciplinary rules and leaving Mr. Kline and his counsel to guess, while they prepared for trial, which alleged conduct violated which rule(s).   On November 29, 2010, less than two months before Kline's disciplinary trial was scheduled to begin, the KDA finally provided Kline's counsel with a letter detailing what conduct allegedly violated which sections of the KRPC.

### 3.   Panel Bias: Two of Three Panel Members Contributed to Campaigns of Mr. Kline's Political Adversaries

4.35   Under the Kansas disciplinary system, ethics charges are tried to a panel of three attorneys, all of whom come from a select list of attorneys approved by the Kansas Supreme Court. By a selection process whose workings are unknown to the public and to Kline, the Kansas Supreme Court somehow allowed the selection of an attorney panel to hear Kline's case even though two of the three attorneys had previously donated to Mr. Kline's political opponents.

4.36   Mr. Kline's Disciplinary Panel was composed of attorneys Jo Ann Butaud, Jeffrey A. Chubb and Calvin J. Karlin.  Karlin had donated money in 2005-06 to Paul Morrison to support his successful challenge to Mr. Kline as Kansas Attorney General.   The Morrison campaign was largely defined by Morrison's allegation that Kline's investigation of abortion centers was a "witch hunt."   Worse yet, not only did some of the ethics charges against Mr. Kline coincide with Morrison's political charges during the campaign, but one of the

ethics complainants against Kline was filed by a Morrison staffer who investigated Kline at Morrison's instruction and provided information to the KDA.

4.37    Karlin had also contributed to Gov. Kathleen Sebelius, an abortion rights Democrat who appointed four of the seven Kansas Supreme Court justices. The antagonism of various state agencies under the Sebelius administration toward Mr. Kline's investigation is not only well documented in the public realm but it formed the backdrop for one of the violations found by the Panel.

4.38   Chubb had previously donated money to the campaign of a different Kline opponent, and had been published in Newsweek Magazine demeaning the very kind of "conservative Republican" for which Kline was a standard bearer in Kansas.

4.39    After being appointed to hear Kline's case, both Karlin and Chubb refused to voluntarily disclose their conflict and neither recused after the information came to light in.

### 4.    The Disciplinary Trial of Mr. Kline.

4.40    Mr. Kline's disciplinary case was tried in two phases.  The charges for Count One, limited to Kline's conduct as Attorney General, were tried from February 21 - 25 and February 28 – March 2, 2011.  The charges for Count Two, limited to Kline's conduct as Johnson County District Attorney, were tried from July 19 - 22, 2011.

4.41    On or about October 12, 2011, the panel released a 185-page report finding that Mr. Kline committed 21 rule violations based on ten factual scenarios.

The Panel Report demonstrated a perplexing combination of incompetence and bias, (i) finding that Kline had violated three rules that did not even exist at the time of the alleged conduct, (ii) applying incorrect legal standards to find other violations, (iii) refusing to even mention significant amounts of exculpatory evidence (e.g., the DeFries and King Reports), (iv) distorting testimony to reach conclusions detrimental to Kline and contrary to the actual record, and (v) effectively disregarding unrebutted testimony of Kline's witnesses, including the character testimony of United States District Judge Eric Melgren, who testified favorably about some of Mr. Kline's work as Attorney General.

4.42   Some of the biased panel's "credibility" findings later received great deference from the post-recusal court, which upheld the Panel's recommendation that Kline's law license be suspended indefinitely.

## 5.   Proceedings Before a Biased Kansas Supreme Court.

4.43   On December 22, 2011, Mr. Kline filed with the Kansas Supreme Court his 175-page *Exceptions* to the Panel's findings. The Exceptions were so voluminous only because the Panel errors and omissions were so numerous and Mr. Kline was committed to advancing the Truth about his conduct.

4.44   Kline soon moved the Court for an order expanding from 50 to 180 the page limitations for the appeal briefs.  In February 2012 Chief Justice Lawton Nuss signed an order expanding the page limit to only 80 pages, five more than the

23

KDA suggested and a mere 30 more pages than the page limit afforded any Kansas attorney charged with *a single* disciplinary violation.

4.45   On May 15, 2012, Mr. Kline filed his appeal brief, having been forced by the court's page limitation to eliminate, or greatly reduce, many of the factual and legal arguments he would have otherwise put forth, including his challenge to the lawless conduct of the KDA /Review Board and to the panel bias.

4.46   Also on May 15, 2012, Mr. Kline filed the *Motion of Respondent Phillip D. Kline for the Recusal of Justice Carol A. Beier and of Chief Justice Lawton Nuss* (hereinafter "Recusal Motion").  The Recusal Motion was directed primarily at Justice Beier due to her authorship of the court's opinions in *Alpha* and *CHPP v. Kline*, both of which were exposed in the Recusal Motion as extraordinarily misleading and prejudicial to Mr. Kline.  The Recusal Motion was a devastating critique of Justice Beier's *Alpha* and *CHPP* opinions and their correlation to Justice Beier's personal ideology and judicial philosophy.  To any objective observer of the Kansas Supreme Court's interference with Kline's investigations and its work in the *Alpha* and *CHPP* opinions, the Recusal Motion was an unanswerable embarrassment to the Court.

4.47   The Recusal Motion's request for the recusal of Defendant Chief Justice Nuss did not relate to the *Alpha* and *CHPP* opinions, but rather to an earlier and unrelated matter involving Mr. Kline and the Chief Justice.

4.48   The Recusal Motion also *suggested* the recusal of Chief Justice Nuss and the other three justices who had joined Justice Beier's *CHPP v. Kline* opinion,

explicitly recognizing that those justices may have been misled by Justice Beier's distortions of the fact record and therefore may have joined the opinion without harboring personal bias or ill-will toward Mr. Kline.   As discussed in more detail below in the context of the First Claim for Relief, Defendant Justices Nuss, Beier, Luckert, Johnson, Rosen recused themselves from the Kline appeal within three days of the Recusal motion, with Justice Biles then proceeding to construct a substitute "Kansas Supreme Court" in violation of the Kansas Constitution.

4.49    After the five recusals, Mr. Kline moved again for an expanded page limit for the appeal briefs, asking the post-recusal court to allow 30 additional pages for Kline to fully develop his defense to the errors in the Panel Report (a defense that had to address ten complex and fact-driven ethical issues as well as the harshness of the sanction).  Justice Biles denied the motion.

### 6.    The Suspension of Mr. Kline's Law License: An Arbitrary and Lawless Decision by an Unconstitutional Court.

4.50    On October 18, 2013, the post-recusal court issued a Decision/ Judgment (i) finding that Mr. Kline had violated eleven rules of the KRPC based upon six separate fact scenarios, but (ii) declining to adopt the Panel recommendations regarding ten other alleged rules violations.  Based on those findings and conclusions, the post-recusal court still adopted the Panel's recommendation by indefinitely suspending Mr. Kline's law license.

4.51   The post-recusal court's Decision/ Judgment was loaded with factual error, imputing words to Mr. Kline that he did not say, imputing intentions and

beliefs to Mr. Kline that he did not hold, contradicting, distorting or mischaracterizing undisputed evidence in the record, and refusing to even acknowledge (like the Panel it appointed) uncontradicted evidence favorable to Mr. Kline.

4.52 The post-recusal court's Decision/Judgment was likewise loaded with legal error, effectively rewriting one rule of the KRPC to contradict its plain meaning, misinterpreting case law to baselessly attack Mr. Kline and his legal judgment, and creating (or implicitly adopting from the Panel) legal novelties that deprived Mr. Kline of fair notice of what the Kansas Rules of Professional Conduct require and forbid. Of particular concern were the rewrite of KRPC 8.1(b) and the arbitrary applications of the "catch-all" provisions in KRPC 8.4, thereby making them hidden trap doors that can be applied arbitrarily and with standardless discretion in the future to politically unpopular and/or other disfavored attorneys (or maybe just to Mr. Kline).

4.53 The post-recusal Court's sanction of "indefinite suspension" was based at least in part on what it deemed to be the aggravating factor of "selfish motive." It held that Kline deserved special reprimand because he tried to "promote his own message," tried to "cull favor with the public for his cause," and had a "fervid belief or desire to see his cause succeed." Further, the post-recusal Court found it significant that Kline removed his own name from a filing so that it would not be viewed as coming from "just the abortion attorney." This was the first time Kline's belief or "cause" was cited as a reason for aggravating discipline.

26

**7.     Mr. Kline's Futile Attempt to Persuade the Post Recusal Court to Correct its Errors.**

4.54    On December 2, 2013, Mr. Kline filed a 90 page *Motion of Respondent Phillip D. Kline for Rehearing or Modification*, setting forth in detail the post-recusal court's factual and legal errors.   The KDA immediately sought a 30 day extension of time to respond, which Kline did not oppose.

4.55    The post-recusal court did not wait for the KDA's response or even rule on the KDA's motion for additional time.   Almost certainly violating the Kansas Supreme Court's internal procedures for addressing such a motion, the post-recusal court denied the motion without comment on December 10, 2013, a mere six business days after it was filed.   Such a speedy denial of such a substantive motion is *ipso facto* proof that the post-recusal court gave no serious consideration to correcting its well-documented legal and factual errors and even suggests that the post-recusal court's blatant errors of fact and law were deliberately designed to destroy Mr. Kline.

**8.     Petition to United States Supreme Court**

4.56     On March 10, 2014, Kline filed a Petition for a Writ of Certiorari in the United States Supreme Court, seeking review of some, but not all issues addressed by the post-recusal court.

4.57    On April 28, 2014 the United States Supreme Court denied review, which was not a comment on the merits of the issues raised by Kline.

## General Allegations of Constitutional Deprivations.

5.1     Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 4.57 as though fully restated here and further states the following.

5.2     Mr. Kline had and has a property interest in his Kansas law license and in his reputation, which was irreparably harmed by the deliberate and/or reckless conduct of the Defendants.

5.3     As a direct and proximate result of the post-recusal court's unconstitutional conduct as alleged herein, Mr. Kline's license to practice law in the United States Court of Appeals for the Tenth Circuit was suspended.

5.4     As a direct and proximate result of the post-recusal court's unconstitutional conduct as alleged herein, Mr. Kline ability to obtain a license to practice law in any other jurisdiction in the United States of America is greatly impaired, if not impossible.

5.5     All of the Defendants are state actors and acted under color of law.

5.6     Mr. Kline had, and continues to have, a liberty interest in fair and unbiased procedures and tribunals created by the State of Kansas.

5.7   Mr. Kline had, and continues to have, a liberty interest in equal treatment under the law.

5.8     Defendants are being sued here in their individual and official capacities, and no immunities are available to them for the equitable relief sought.

5.9     Because of the many procedural violations and novelties that occurred during the court of Mr. Kline's disciplinary proceedings, he was denied a full and fair opportunity to be heard.

5.10    There can be no preclusive effect from a void judgment.

5.11    The Rooker-Feldman doctrine does not apply to a void judgment.

5.12    Additional factual allegations appear in the context of specific Claims for Relief that follow.

## FIRST CLAIM FOR RELIEF
### Violation of Due Process Caused by Unlawful Composition of Court
### (Fewer Than Four Justices Sitting and Voting in the Majority)

6.1     Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 5.12 as though fully restated here and further states the following.

6.2     As noted in paragraph 4.47 above, Mr. Kline filed the Recusal Motion on May 15, 2012 seeking the recusal of Defendants Chief Justice Nuss and Justice Beier.  On May 18, 2012, the Kansas Office of Judicial Administration issued a press release **(Exhibit 1)**[1] stating that "five of the seven justices of the Kansas Supreme Court" had voluntarily recused themselves from hearing Mr. Kline's disciplinary case.  The press release did not identify the recusing justices but stated that "[t]he justices cited the Kansas Code of Judicial Conduct Rule

---

[1] All of the exhibits referenced in this Complaint are attached hereto and incorporated herein fully by reference.

29

2.11" as requiring the recusals based on the justices' earlier roles in matters involving Kline.   The Court's press release also stated:

> Justices Dan Biles and Nancy Moritz were not involved in any of the earlier cases involving Mr. Kline and will therefore continue to sit on his disciplinary case.  Justice Biles will be the Presiding Justice.  He and Justice Moritz will be joined by five other Kansas judges as the disciplinary case moves forward to final decision.

6.3     The Kansas Supreme Court never issued an Order appointing Justice Dan Biles as Presiding Justice for the Kline case, and it is unclear who could have "appointed" him, or on what authority.   On May 23, 2012, Defendant Justice Biles issued an Order (**Exhibit 2**) identifying the recusing justices as Chief Justice Lawton Nuss, Justice Marla Luckert, Justice Carol Beier, Justice Eric Rosen and Justice Lee Johnson.

6.4      On June 4, 2012, Defendant Justice Biles issued an Order (**Exhibit 3**) appointing Kansas district court judges Edward L. Bouker, Bruce T. Gatterman and Michael J. Malone, and court of appeals judges Henry W. Green, Jr., and Karen M. Arnold-Burger, to "serve temporarily on the Supreme Court" to decide Kline's disciplinary case.  Justice Biles' Order cited Article 3, Section 6(f) of the Kansas Constitution and K.S.A. 20-3002(c) for his appointment authority.

6.5     Article 3, Section 2 of the Kansas Constitution states:

> The supreme court shall consist of not less than seven justices who shall be selected as provided by this article.  All cases shall be heard with not fewer than four justices sitting and the concurrence of a majority of the justices sitting and of not fewer than four justices shall be necessary for a decision.

6.6     Mr. Kline was entitled to have his disciplinary case reviewed and decided by a properly constituted Kansas Supreme Court, with at least four duly appointed justices sitting and voting as a majority of the Court.  By sitting, voting and entering a Decision/Judgment in Kline's case in violation of the unambiguous "four justice" requirement of the Kansas Constitution, the members of the post-recusal court acted without jurisdiction, without the power of the Kansas Supreme Court, and its Decision/Judgment was void *ab initio*.

6.7     By sitting, voting and entering a decision in Mr. Kline's case in violation of the unambiguous "four justice" requirement of the Kansas Constitution, the members of the post-recusal court acted as an unlawful tribunal and therefore deprived Mr. Kline of a property interest without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution, all of which give rise to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983 against Defendants Biles, Moritz, Arnold-Burger, Green, Bouker, Gatterman and Malone, and possibly other Defendants.

## SECOND CLAIM FOR RELIEF
### Violation of Due Process Caused by Unlawful Composition of Court
### (Unconstitutional Judicial Appointments by Defendant Justice Biles)

7.1     Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 6.7 as though fully restated here and further states the following.

7.2     Compounding the Due Process violation set forth in the First Claim For Relief is the unlawful appointment of the replacement judges by Defendant

Justice Biles. Kan. Const. Art. 3, §6(f) authorizes the temporary appointment of Kansas district judges to sit on the Kansas Supreme Court, stating "The supreme court may assign a district court judge to serve temporarily on the supreme court."

7.3     Likewise, K.S.A. §20-3002(c) provides statutory authority for the temporary appointment of appellate judges to sit on the Kansas Supreme Court, stating "The supreme court may assign a judge of the court of appeals to serve temporarily on the supreme court."

7.4     Justice Biles, acting as an individual justice, had no constitutional, statutory or common law authority to make those temporary appointments. There is no constitutional or statutory authority in Kansas for a *single justice* to fill supreme court vacancies with temporary appointments, although Kan. Const. Art. 3, §6(e) does empower a single justice to "to assign judges of district courts temporarily to other districts." Consequently, aside from the inadequate number of justices who sat on the post-recusal court, the appointments by Defendant Biles of the five district and appellate judges were unlawful and provide an independent reason why the post-recusal court was unlawfully constituted and incompetent to enter a valid judgment.

7.5     The foregoing conduct of Defendant Biles, with the acquiescence of the other Defendants, created a post-recusal court that acted as an unlawful tribunal in violation of the Kansas Constitution and in violation of Mr. Kline's rights under the Due Process Clause. Consequently, the actions of the post-recusal court deprived Mr. Kline of a property interest without due process of law in violation of the Fifth and

Fourteenth Amendments to the United States Constitution, all of which give rise to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983 against Defendant Justices Biles, Moritz, Arnold-Burger, Green, Bouker, Gatterman and Malone and possibly other Defendants.

**THIRD CLAIM FOR RELIEF**
**Violation of Article IV, Section 4 of the United States Constitution**

8.1     Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 7.5 as though fully restated here and further states the following.

**8**.2     Like all Americans and all Kansans, Mr. Kline is guaranteed by Article VI, Section 4 of the United States Constitution that he will live in a state with a Republican form of government, wherein the powers of sovereignty are vested in and exercised by the people, either directly or through representatives chosen by the people.

8.3     In the State of Kansas, as in most states, the Republican form of government is manifested in a constitution, adopted by the people or their representatives, and (i) defining the three branches of government, (ii) dividing executive, legislative and judicial powers among them, and (iii) creating a system of checks and balances designed to prevent any branch of government from encroaching on the powers accorded to the other branches.

8.4     Judicial power in Kansas is constrained in the Kansas Constitution by the manner in which justices can be appointed by the Court. As noted in the Second

Claim for Relief, the Kansas Supreme Court has the power to fill temporary vacancies under Kan. Const. Art. 3, §6(f).  Permanent vacancies "shall be filled by appointment by the governor of one of three persons possessing the qualifications of office who shall be nominated and whose names shall be submitted to the governor by the supreme court nominating commission established as hereinafter provided."   Kan. Const. Art. 3, §5(g) defines who can serve on the supreme court nominating commission and explicitly excludes anyone who "hold[s] any other public office. . . ." Nowhere is any individual but the governor empowered to make individual appointment to fill supreme court vacancies.

8.5   Defendant Biles, therefore, in all respects acted unlawfully and usurped the appointment powers reserved to the Kansas Governor and the Kansas Supreme Court when in June 2012 he acted alone to make five appointments in an attempt to resurrect an inoperative Kansas Supreme Court solely for Kline's disciplinary case.

8.6    The foregoing conduct of Defendant Justice Biles, with the participation and acquiescence of most of the other Defendants, was a usurpation of power in violation of the Kansas Constitution and deprived Mr. Kline of his right to live in Kansas under a Republican form of government as guaranteed by Article VI, Section 4 of the United States Constitution, all of which gives rise to a claim for relief under 42 U.S.C. §1983 against Defendant Justice Biles, Moritz, Arnold-Burger, Green, Bouker, Gatterman and Malone, and possibly other Defendants.

34

## FOURTH CLAIM FOR RELIEF
### Violation of Due Process Caused by Appellate Clerk's Refusal to Docket Motion Challenging Jurisdiction of Post-Recusal Court

9.1     Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 8.6 as though fully restated here and further states the following.

9.2     On February 25, 2014, Kline filed *Respondent Phillip D. Kline's Motion to Vacate and Dismiss Void Judgment* ("Motion to Vacate"), seeking to vacate the post-recusal court's "judgment" because of its unlawful composition and because Justice Biles possessed no authority to appoint replacement judges. Under Kansas law and in every other jurisdiction known to Mr. Kline, there are no time limitations for attacking a void judgment.

9.3     On February 27, 2014, Defendant Carol Green, the Clerk of the Kansas Appellate Courts, returned by mail to Mr. Kline's counsel the original and all eight copies of the Motion to Vacate, stating in a cover letter that the post-recusal court's December 10, 2013 order denying Mr. Kline's motion for rehearing or modification had "closed this matter" and that "Nothing more can be filed."  **(Exhibit 4)**

9.4     When Mr. Kline's attorneys received Green's letter with all copies of the motion, they were about to file a second motion to vacate the judgment based on other due process violations that had occurred during Kline's disciplinary proceedings, including most of the issues that Kline could not raise because of the overly-restrictive page limitation for his appeal brief.

9.5     Desiring to avoid the futile act of filing another motion that would be rejected by the Kansas Supreme Court and/or the Appellate Clerk, and further wishing to avoid the appearance of disrespecting the Court's erroneous position that no further motions could be filed, Mr. Kline's counsel faxed a letter to Defendant Green on March 7, 2014 **(Exhibit 5)** inquiring whether a future motion addressing due process violations would likewise be rejected.

9.6     On March 10, 2014, Kline's counsel received a letter back from Defendant Green dated March 7, 2014 **(Exhibit 6)** stating:

> Because Case No. 106,870, In Re: Kline, is a closed case, the appellate clerk's office is unable to accept further filings.  Thank you for inquiring before delivering any further motions to this office.

9.7     With Defendant Green, with or without the participation of others, having denied Mr. Kline any opportunity to be heard on (i) the post-recusal court's lack of jurisdiction, (ii) the fact of a void judgment, and (iii) other due process violations that permeated Kline's disciplinary case and could render the judgment void, she violated Kline's due process rights to be heard at a meaningful time and in a meaningful manner under the Fifth and Fourteenth Amendments to the to the United States Constitution, all of which give rise to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983 against Defendant Green and possibly other Defendants.

## FIFTH CLAIM FOR RELIEF:
## Violations of Due Process Based Upon Arbitrary Conduct
## by the Judicial Branch of Government

10.1    Plaintiff Phillip D. Kline hereby incorporates paragraphs one through

9.7 as though fully restated here and further states the following.

10.2     The post-recusal court found that Mr. Kline violated eleven rules of the

KRPC in six fact scenarios.  Those scenarios, and the action of the post-recusal court,

are fairly summarized as follows:

a. **Attaching Sealed Documents to Alpha Brief**.  Faced with conflicting
   court orders in the *Alpha* case that the Kansas Supreme Court refused to
   clarify (in spite of the best efforts of Mr. Kline and his staff)  regarding
   how "partially-sealed" documents[2] could be addressed in the *Alpha* brief,
   and needing to quell a public uproar caused by dishonest statements in the
   Centers' briefs that threatened Kline's investigation, Kline and his staff
   concluded that they could attach to their *Alpha* brief redacted copies of the
   "partially sealed" documents.  Mr. Kline reasoned that because he was
   permitted to discuss verbatim in the body of the brief the content of the
   documents he was attaching, there was no harm in simply attaching them
   as redacted.  The Kansas Supreme Court, denying the Centers' motion for
   contempt against Kline in *Alpha*, held that neither the parties nor the
   proceeding had been prejudiced by the attachments.  The post-recusal
   court, however, invoked the highest level of abstraction to find two

---

[2] The term "partially sealed" is used here to highlight the novel situation that Kline and
his staff were facing in *Alpha*.  The content of documents previously under seal for the
inquisition was suddenly, by order of the Supreme Court, fair game for public discussion
in appeal briefs and at oral argument.  In effect, the Supreme Court's order "broke the
seal" but left the parties guessing as to the proper boundaries for revealing the "sealed"
content of documents.

violations: that the attachments that were prejudicial to no one were still somehow "prejudicial to the administration of justice," and also that Kline's decision reflected poorly on his "fitness to practice."  The arbitrariness of the Decision is two-fold.  First, there is no justifiable distinction between revealing information in the text of a brief and revealing it in an attachment to the brief.  Second, it is but an arbitrary abstraction, after the Alpha court found "no prejudice" to the parties or the proceedings in 2006, for the post-recusal court to find "prejudice" as an undefinable "harm to the justice system more generally."

b. **Motion To Clarify**.  After listening to his subordinate, Eric Rucker, argue the *Alpha* case to the Kansas Supreme Court in 2005, Kline was concerned that the justices may have been misled by Rucker's response regarding the scope of Kline's investigation.  The problem was not with Rucker's candor, but rather with the difficulty posed by a confusing sequence of inconsistent questions from the justices about whether the records of mandatory reporters other than the abortion centers had been "sought" or "subpoenaed."  The questions sought information about other unrelated investigations by Kline's office which were under seal by District Court order.  Rucker was constrained by a court order from revealing the entities that had received subpoenae and Mr. Kline was concerned that the justices may have taken away the false impression that he had not sought records from other mandatory reporters.  The Kline investigation had, in fact, obtained the records of other mandatory reporters indirectly by issuing a subpoena to SRS (the state repository for such reports).  Limited by the same seal order, Kline filed a *necessarily nuanced* "Motion to Clarify" with the goal of curing any wrong impression the justices may have taken from Rucker's response: "Kline has sought records and information from other mandatory reporters besides the petitioners in the present mandamus action."  With

the Panel having found Kline to have violated a rule that did not even exist at the time of his conduct, the post recusal court rescued the Panel from its own incompetence by arbitrarily abandoning the rule of law in Kansas on "materiality" to find Kline guilty of (i) two KRPC violations centered on dishonesty, and (ii) a third (derivative) violation based on the participation of Kline's subordinates. The "dishonesty" attributed to Kline arose from the fact that while Kline had obtained the record **of** other mandatory reporters, he did not obtain them directly **from** the other mandatory reporters. The epitome of arbitrary jurisprudence, all three violations rested solely on the immaterial difference between the meanings of "of" and "from."

c. **Possession of WHCS Medical Summaries**. Testifying before Judge King in *CHPP v. Kline* about his possession of "medical summaries" created from medical records obtained from WHCS, Kline accurately replied that he had a summary "of three records that. . . would have jurisdiction in Johnson County." A judicial ruling then terminated any further questions on that topic so that Kline did not address other summaries unrelated to Johnson County. Arbitrarily distorting Kline's testimony, the post-recusal court wrote that Kline "testified. . . that he had **only** 3 summaries," which is false because Kline never said "only." Kline was punished not for dishonesty, but for what the court falsely attributed to him. Responding months later to an impromptu question from Justice Beier while he was observing oral argument in *CHPP v. Kline* (having prepared neither to argue the case or testify about extraneous matters), Kline stated an honest "belief" that was later proven wrong about what medical summaries his office still possessed. The post-recusal court punished Kline's mistaken belief as deliberate dishonesty even though (i) no one could identify any motive for Kline to lie about summaries that he lawfully possessed, and (ii) Kline's good

39

faith was evidenced by the fact that he informed Judge Anderson that he was in possession of the summaries as soon as his staff discovered them. Mistaken belief, or human error, about documents long since irrelevant to Kline's investigation and to the Alpha case was punished as deliberate dishonesty and a violation of two rules of the KRPC. And like the findings relating to the Motion To Clarify, the post-recusal court arbitrarily abandoned the rule of law in Kansas governing "materiality" to justify its findings.

d. **Failure to Correct Response to KDA**. Mr. Kline's failure to correct one answer made to the KDA during the disciplinary investigation (an answer that was arguably accurate and needed no correction) was deemed to be a disciplinary violation, but only because the post-recusal court "interpreted" the text of KRPC 8.1(b) to mean the opposite of how it was actually written. Mr. Kline's duty under Rule 8.1(b) was to correct any "known misapprehension" of the KDA, but it was undisputed that the KDA had no misapprehension. The post-recusal court gutted the rule and fabricated a violation by arbitrarily eliminating the central requirement of a "misapprehension," and then arbitrarily misrepresenting case law to supporting its novel "interpretation."

e. **Advice to Grand Jury on Mandatory Reporting of Child Abuse**. Mr. Kline's accurate and competent legal advice to the Johnson County Grand Jury was deemed unethical because of the incurable ignorance of <u>others</u>. The post-recusal court found that Mr. Kline deliberately misled the grand jury when he and his staff failed to inform it about *Aid For Woman v. Foulston*, 427 F.Supp.2d 1093 (D. Kan. 2006), a case decided by United States District Judge J. Thomas Marten. However, Kline's view of the *Aid For Women* case was consistent with Judge Marten's holding and consistent with the ruling of Judge Anderson when he issued subpoenae for records. In effect, Mr. Kline was harshly criticized and arbitrarily

disciplined by the post-recusal court for sharing the legal opinion of two other judges, merely because of the unhappiness of one misguided and disgruntled juror.  To achieve the violation, the post-recusal court imputed statements to Mr. Kline that he did not say, imputed beliefs that he did not hold or advocate, and took some of his words completely out of their specific context to make his perfectly accurate legal advice appear to be inaccurate.  The post-recusal court compounded its errors by arbitrarily holding Mr. Kline to a non-existent statutory obligation and by adopting as fact (much like the Panel) the juror's perjured testimony which was clearly contradicted by the grand jury record.

f.  **Motion to Enforce Grand Jury Subpoena**.  Mr. Kline's decision to file a motion to enforce a valid Johnson County grand jury subpoena, still in force and never withdrawn, as the time for the fractured and inert grand jury was expiring.  The filing of the motion was deemed to be an unethical act in excess of Kline's statutory authority even though one Justice Biles was expressly "struggling" with the issue and Justice Moritz conceded that the grand jury statute was "not clear."  Drawing conclusions about a statute that neither authorized nor forbade Kline's conduct, the post-recusal court arbitrarily disciplined Kline for acting in excess of his authority.  The post-recusal court also repeatedly and arbitrarily condemned Kline for disregarding a grand juror request when the objective fact record establishes that Kline complied with the request.  For guessing wrong about conduct that was not forbidden anywhere, Mr. Kline was disciplined for conduct that reflected poorly on his fitness to practice law.

10.3    Maybe the most significant aspects of the Decision on these issues are the un-cabined, and therefore unpredictable applications of the KRPC 8.4 "catch-all"

41

rules. They include not only the made-for-Kline Rule 8.4(d) meaning of "prejudice," which can somehow apply where there is no actual prejudice to anyone, but also the more sweeping and impossible-to-anticipate applications of Rule 8.4 that will not be "confined by a professional norm standard." These post hoc applications of catch-all rules go beyond disputed fact-finding or errors of law; they constitute multiple free-standing violations of procedural and substantive due process because the "ethical violations" fabricated to Mr. Kline's detriment were completely arbitrary, impossible to predict in advance, impossible to defend, unfit for future guidance, insulated from any appeal rights and contrary to objective reality. Laden with such novelties and vagaries, the Decision of the post-recusal court does not just misapply constitutional principles; the Decision is itself a violation of Mr. Kline's due process rights.

10.4   It is as if Mr. Kline lived in the universe of Law and Order, while the post-recusal court lived in a parallel universe grounded in fantasy, entitled to do anything and say anything about Mr. Kline, detached from reality and insulated from any appellate review.   Such judicial capriciousness shocks the conscience when it results in the deprivation of life, liberty or property.

10.5   The foregoing conduct of the post-recusal court, deprived Mr. Kline of a property interest without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution, all of which give rises to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983 against Defendants Biles, Moritz, Arnold-Burger, Green, Bouker, Gatterman and Malone, and possibly other Defendants.

## SIXTH CLAIM FOR RELIEF:
### Due Process Violation:
### Denial of Right to Hearing in Meaningful Manner

11.1    Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 10.5 as though fully restated here and further states the following.

11.2    As addressed in detail in paragraphs, 4.27 through 4.55, supra, Mr. Kline's rights to a fair and unbiased hearing procedure, a fair and unbiased hearing panel, and a fair and unbiased court were all violated by the Defendants.  The 80-page briefing limitations was particular harmful because it prevented Mr. Kline from even raising a number of troubling constitutional issues.

11.3    Although Mr. Kline's disciplinary proceedings involved a great deal of paper, many motions and decisions, and over 100 hours of trial, none of that was a guarantee that the proceedings were conducted "in a meaningful manner," in a constitutional sense, when so many constitutional defects abounded and were ultimately ignored or dismissed by an improperly constituted tribunal.

11.4    All of the procedural and constitutional defects described above, most of which the post-recusal court effectively barred from review, prevented Mr. Kline from being heard at a meaningful time and in a meaningful manner in violation of the Due Process clause of the Fifth and Fourteenth Amendments to the United States Constitution, all of which give rises to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983 against Defendants Biles, Moritz, Arnold-Burger, Green, Bouker, Gatterman and Malone, and possibly other Defendants.

43

## SEVENTH CLAIM FOR RELIEF:
### Equal Protection Violations

12.1    Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 11.4 as though fully restated here and further states the following.

12.2    The practice of law by attorneys in the courtrooms of Kansas and in every other jurisdiction in the United States, state and federal, involves on a daily basis (i) disputed statements and interpretations of facts, (ii) disagreements over legal principles, (iii) conflicting interpretations of case law, (iv)  zealous advocacy that shades and exploits gray areas of fact and law, (v) other advocacy so creative that it is beyond the gray areas of fact and law, and (vi) inadvertent human error.  Too often, attorneys lose sight of their ethical and moral obligations to pursue truth, justice and the rule of law, choosing instead the priority of victory for their clients at any costs.  Rarely does the overzealous conduct of such attorneys result in disciplinary action of any kind.

12.3    Likewise, the state and federal courts have spawned great controversy over the past fifty years as a result of judicial decisions that read creative terms into laws and constitutions, or disregard what many consider to be the clear text of laws and constitutions.  The U.S. Supreme Court itself remains bitterly divided on issues like abortion and gay marriage with lawyers and citizens arguing (often with some basis) that judges are merely reading this own ideologies into the law, often to the destruction of the majority will.  Rarely, if ever, does the overzealous work of jurists

44

result in disciplinary action of any kind, even when a lower court judge gets reversed by a unanimous higher court.

12.4   The arbitrariness of Defendants' treatment of Mr. Kline, and of their application of the KRPC to Kline's conduct, is exposed by comparing it to the Defendants' own conduct and/or what the Defendants have allowed other anti-Kline attorneys get away with in Kline-related litigation.

12.5   Mr. Kline's disciplinary case and harsh sanction exposed a shocking double standard for attorney discipline in Kansas.  Mr. Kline was deemed to have been (i) deliberately dishonest for ambiguous or incomplete statements, (ii) abusive of his public office and/or judicial authority for decisions and conduct in novel circumstances with no factual or legal precedent to guide him,  and (iii) unfit to practice law based upon his view of the law and the exercise of objectively reasonable professional judgment.  Meanwhile, Kline's legal adversaries, the lawyers who composed his disciplinary Panel, the KDA, and virtually every jurist involved in *Alpha, CHPP v. Kline*, and Kline's disciplinary case were free, with no repercussions, to engage in objectively lawless, deceptive and unethical conduct even as they condemned Kline for things he did not do or for *de minimis* human error.

12.6   The "made-for-Kline double-standard" was achieved by two methods that were and are impossible to defend.  First, the KDA sought, and the post-recusal court delivered, a broad and undefined application of the KRPC 8.4 "catch-all rules," with conduct judged against such overly broad and abstract principles as "prejudicial to the administration of justice" or "reflecting poorly on one's fitness to practice law."

Contrary to how those catch-all rules have been applied by the high courts of other states, which rejected broad interpretations and imposed a "cabining" requirement" to prevent selective application of disciplinary rules, the post-recusal court applied the catch-all rules broadly to find Kline guilty of ethical violations in circumstances lacking any factual or legal precedent.  Second, the KDA sought, and the post-recusal court delivered, fabricated findings of KRPC violations for alleged dishonesty, with such violations made possible only by misrepresentations of Kline's words and conduct, incomplete or inaccurate references to the fact record, and the torturing of the plain meaning of at least one applicable rule.

12.7   In stark contradiction to the unforgiving treatment of Mr. Kline's conduct in novel and challenging circumstances, the misconduct of his adversaries, prosecutors and judges involved clear violations of Kansas rules, procedures and constitutional requirements.  Those same actors, while condemning Kline for dishonesty, repeatedly misrepresented the objective fact record in circumstances where the truth was readily available to them and accuracy could have been achieved with minimal effort.  The unlawful, unconstitutional, dishonest and incompetent conduct of the Defendants (and of others known to the Defendants) includes:

A.   The conduct of **Defendants Justices Nuss, Beier, Luckert, Johnson and Rosen** in:

- Writing or joining the opinion with false statements in the *Alpha* case.

- Writing or joining the false and defamatory opinion in *CHPP v. Kline*, 197 P.3d 370, 287 Kan. 372 (Kan. 12/05/2008), including the

46

falsehood that Kline left no records behind for his successor
(Morrison) and thereby prevented Morrison from doing his job.

- Presiding over Mr. Kline's disciplinary appeal from December 2011
  until May 2012, all the while knowing that their prior conduct
  disqualified them from the case.

- Specifically issuing an order unreasonably and prejudicially limiting
  the length of Mr. Kline's appeal brief to 80 pages.

B.      The conduct of **Defendant Hazlett** in:

- Violating Disciplinary Rule IOP B.3 by deliberately withholding
  strong exculpatory evidence from the Review Board, including the
  vindicating DeFries and King reports.

  Withholding exculpatory evidence from Mr. Kline by refusing to
  inform him of the DeFries report.

- Violating Rule 210(c) of the Kansas Rules Relating to the Discipline
  of Attorneys by filing a formal complaint against Mr. Kline without
  first obtaining a written probable cause finding from the Review
  Committee.

- Continuing to prosecute Mr. Kline for violations (found by the
  Panel) of three rules that did not exist at the time of Kline's alleged
  conduct.

- Suborning the perjury of Grand Juror Stephanie Hensel regarding
  how Mr. Kline's advice to the grand jury negatively impacted the
  grand jury (testimony conclusively contradicted by the grand jury
  record).

- Failing, in violation of Supreme Court App. Rule 3.02, to furnish
  Mr. Kline and his counsel with a copy of the index to the
  disciplinary trial record and exhibits, and then by moving to

47

strike Kline's appellate brief due to the nonconformity **caused by the KDA violation of the rule**.  Unlike the abstract victims allegedly harmed by Kline's alleged "violations," this misconduct was concretely prejudicial to Kline and his counsel, causing unnecessary expenditure of time and effort, unnecessarily depleting funds provided by the state for Kline's defense, and distracting Mr. Kline and his counsel from dealing with more substantive matters relating to the appeal.

- Writing a material and deliberate misrepresentation in the KDA appeal brief regarding the content of the KDA's Formal Complaint (and Amended Complaint) filed against Mr. Kline, conduct aggravated by the fact that the misrepresentation was so easily verified and corrected by a simple review of his own pleadings.

C.    The conduct of Kansas Board for the Discipline Review Committee Members **Sara S. Beezley, Robert I. Guenther and William B. Swearer** in:

- Along with Defendant Hazlett, failing in clear violation of IOP B.3 and B.4 to prepare or share any written materials during the review process and prior to the KDA's filing of the formal complaint against Kline.

D.    The conduct of the Panel, **Jo Ann Butaud, Jeffrey A. Chubb and Calvin J. Karlin** in:

- Issuing an ex parte order placing a large number of the trial exhibits under seal without providing Mr. Kline and his counsel any notice or opportunity to be heard on such an important matter.

- Publishing a Final Report recommending Mr. Kline's suspension that contained deliberate falsehoods, distortions and/or omissions, and that  selectively parsed and misquoted the testimony of Eric Rucker (on one hotly disputed point) to the detriment of Kline when Rucker's testimony was actually supportive of Kline.

48

- Failing or refusing to even mention compelling exculpatory evidence and testimony favorable to Mr. Kline, including the vindicating DeFries and King Reports and the character testimony of United States District Judge Eric Melgren.

- Finding that Mr. Kline had violated three disciplinary rules that did not even exist at the time of the alleged conduct.

- Finding Mr. Kline guilty of one KRPC violation (ultimately rejected by the post-recusal court) by applying an inapplicable standard for the required mental state.

- As to Panel members Chubb and Karlin, failing to disclose before serving on Mr. Kline's ethics panel that they contributed to Kline's political opponents during elections, with Karlin's failure to disclose his support of Paul Morrison particularly egregious for reasons stated in paragraph 4.37, supra.

E.    The conduct of **Stephanie Hensel**, an attorney appointed to serve as the presiding grand juror in Johnson County, in:

o   Conspiring with the grand jury's special counsel (to the exclusion of the other jurors) to craft a secret agreement with Planned Parenthood that (i) subverted the grand jury's purpose by protecting the criminal target, and (ii) waived the absolute immunity that otherwise protected the grand jurors.

o   Deliberately parsing words to accuse Mr. Kline of statements he did not make and of incorrect legal advice that he did not give.

o   Committing perjuring at Mr. Kline's disciplinary trial with testimony that was material to Hensel's own accusation about Kline's legal advice to the grand jury, but clearly contrary to the grand jury record.

F.   The conduct of **Richard Merker and Larry McClain**, attorneys

appointed to serve as special counsel for the Johnson County Grand Jury, in:

- Conspiring with Hensel (to the exclusion of the other jurors) to craft a secret agreement with Planned Parenthood that subverted the grand jury's purpose by protecting the criminal target and waived the absolute immunity that otherwise protected the grand jurors.

- Misrepresenting to the court facts surrounding the secret agreement with Planned Parenthood

- Deliberately withholding from Mr. Kline information about the efforts of the grand jury in conflict with Mr. Kline's statutory duty to advise the grand jury

- In the case of Mr. Merker, accepting the position as special counsel to the grand jury and helping negotiate the flawed agreement with CHPP without even acquainting himself with the standard for the issuance of a grand jury subpoena.  As he later testifying at Mr. Kline's ethics hearing: "I don't have a clue."

G.   The conduct of **Defendants Biles, Greene, Arnold-Burger, Bouker,**

**Gatterman and Malone** (the post-recusal court) in:

- Sitting as the "supreme court" in direct violation of Article 3, Section 2 of the Kansas Constitution.

- Making unauthorized judicial appointments (Defendant Biles) in violation of Article 3, Section 6(f) of the Kansas Constitution.

- Unreasonably limiting the appeal briefs in Mr. Kline's disciplinary appeal to 80 pages when Mr. Kline had to defend 21 alleged and fact intensive violations and when an attorney defending a single violation would have been entitled to 50 pages.

50

- Publishing a Decision against Mr. Kline on October 18, 2013 with at least six material misrepresentations of facts and then refusing to correct them after Mr. Kline called those errors to their attention in his timely filed Motion for Rehearing or Modification.

- "Interpreting" KRPC 8.1(b) in direct violation of the language of the rule and of the KRPC guidelines for how the KRPC must be applied.

- Misrepresenting case law to support their unlawful "interpretation of KRPC 8.1(b).

- Finding that Kline had violated one rule of the KRPC that did not exist at the time of the alleged conduct.

H.    The conduct of former **Attorney General Paul Morrison** in:

- Filing misleading pleadings in *Morrison v. Anderson* by falsely stating that the redacted records possessed by Judge Anderson contained patient identities and that Judge Anderson had allowed the release of protected information;

- Publicly and falsely claiming that Judge Anderson did not find probable cause to issue the subpoenas to the clinics because Anderson probably "did not read" the subpoenas before signing them and that Mr. Kline "salted" the language.

- Publicly and falsely proclaiming that Mr. Kline failed to provide exculpatory evidence to a District Court Judge.

- Coercing and threatening an employee of Kline's office to alter evidence and to surreptitiously inform Mr. Morrison about Mr. Kline's investigation.

I.    The conduct of Attorneys **Dan Monnat and Laura Shaneyfelt**, counsel for George Tiller, in  failing to comply with KRPC 4.4(b) and refusing to

51

notify the Kansas Office of Attorney General when sensitive information relating to unrelated investigations was inadvertently disclosed to them by Attorney General Stephen Six's office.  Rather than comply, Monat and Shaneyfelt fully examined the disc without notifying Mr. Six's office.

        J.      The conduct of **Lee Thompson and Pedro Irigonegaray**, counsel for CHPP and WCHS in the Alpha case, in making deliberate misrepresentations in their *Alpha* briefs filed in the Kansas Supreme Court, misrepresentations that were later kindly and euphemistically characterized by Judge Anderson's attorney in the Kline disciplinary hearing as taking  "liberties with the record."

       12.8   There is and was no rational basis, nor any significant or compelling governmental interest, to justify the Defendants' aggressive pursuit and harsh punishment of Mr. Kline, with all of the novelties that confronted him, while ignoring all of the other documented instances of dishonesty and lawlessness of Kline's adversaries, prosecutors and judges and judges, except for Defendants' collective political hostility toward Kline and toward Kline's commitment to enforce Kansas' child abuse and abortion laws.

       12.9   Mr. Kline was singled out by the Defendants for a special form of disciplinary prosecution and punishment while others who committed objectively more serious violations have been allowed to continue practicing law in Kansas with no adverse ramifications, and apparently no investigations.

       12.10   Because all of the Defendants (excepting Defendants Carol Green and Justice Stegall) have been on notice of these many violations as relevant to and/or

occurring during Mr. Kline's disciplinary case, and with all of them having had both the duty and the ability to report the violations even up to the present time, the violation of Mr. Kline's equal protection rights, for what has effectively been a selective prosecution, is a continuing violation.

12.11  The foregoing acts and omissions of the Defendants violated Mr. Kline's right to  equal protection under the Fourteenth Amendment to the United States Constitution, all of which give rise to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983 against all of the Defendants (excepting Defendants Carol  Green and Justice Stegall).

**EIGHTH CLAIM FOR RELIEF**
**Violation of Due Process Due to Conflict of Interest**
**Created by Kansas Supreme Court's Multiple Roles**
**Covering Everything from Fact Complainant to Executioner**

13.1    Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 12.11 as though fully restated here and further states the following.

13.2    The multiple roles of the Kansas Supreme Court and/or its justices as (i) fact complainants in Mr. Kline's disciplinary case, and (ii) the institution at whose pleasure the KDA (prosecutor) serves, (iii) the body with ultimate supervisory authority over the Kansas disciplinary process, review boards and hearing panels, and (iv) the body with final authority to decide Mr. Kline's case and administer punishment with no right to appeal, created a fatal and irreconcilable conflict of interest and irreparably tainted Mr. Kline's disciplinary case.

13.3 By its direct involvement in investigating and discovering certain underlying facts in the Kline litigation, by having served as one of Kline's accusers, by having ultimate control over the prosecutor (KDA) and the disciplinary process, and by having the final power of decision and punishment, the Kansas Supreme Court and its disciplinary process in the Kline case violated the most fundamental principles of due process as first defined by Lord Coke in *Dr. Bonham's Case*, 8 Rep. 114a (C.P. 1616).

13.4 The Court's multiple and conflicting roles described in the preceding paragraph were not cured or reconciled by the five recusals and replacement judges, and therefore deprived Mr. Kline of a fair and unbiased hearing in violation of the Due Process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, all of which give rise to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983.

### NINTH CLAIM FOR RELIEF
### Violation of First Amendment and Due Process Rights
### For Enhancement of Disciplinary Sanction Without Notice
### Based on Fervid Beliefs and Devotion to Cause

14.1 Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 13.4 as though fully restated here and further states the following.

14.2 While imposing on Kline the severe disciplinary sanction of indefinite suspension, the post-recusal court improperly cited as aggravating factors Kline's "fervid beliefs," his "desire to see his cause succeed," his efforts to "promote his own

message," and actions to "cull favor with the public."  Further, it viewed as relevant the fact that Kline's motion to enforce the grand jury subpoena criticized that grand jury, its specially appointed counsel, the presiding judge, and the criminal target that was in bold non-compliance with the subpoena.

14.3     Paradoxically, the post-recusal court also found it an aggravating factor that Mr. Kline at one point attempted to lower his profile in the case by removing his signature block from a motion so that it would not be criticized as coming from "just the abortion attorney.

14.4     The post-recusal court's use of such factors to enhance punishment is constitutionally troubling because Mr. Kline's "cause" and "fervid beliefs" just happened to coincide with (i) the law of Kansas that he was obliged as a prosecutor to enforce, and (ii) the goals of the citizens of Johnson County who were responsible for convening the grand jury in the first place.  It is apparently yet another "made-for-Kline" novelty of the post-recusal court that Kansas prosecutors must zealously represent the public but may not do so with "fervid beliefs" or with a "desire to see his cause succeed," even if "his cause" is also the public's cause.

14.5   Setting aside the manner in which the post-recusal court manipulated and ignored facts in order to arrive at its observations about Mr. Kline's motives, the fact is that Mr. Kline had and has a First Amendment right to hold those beliefs, and he was not afforded prior notice that his beliefs could or would be used as aggravating factors in his discipline.  Were Mr. Kline afforded such notice,

55

he could have developed the facts about his beliefs in greater detail at trial so that the Panel and the post-recusal court could have approached the issue with greater factual accuracy and less ignorance about Mr. Kline's priorities.

14.6    Indeed, one will search in vain in the Panel report, the writings of the KDA, the writings of the pre-recusal court, and the writing of the post-recusal court, for any emphasis on what has always been Mr. Kline primary motive: prosecution of child rape and the "providers" who run cover for child rapists.

14.7    The conduct of the post-recusal court in punishing Mr. Kline for his beliefs, and for so doing without notice, is a violation of his rights under the First and Fourteenth Amendments to the United States Constitution, all of which gives rise to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983.

**TENTH CLAIM FOR RELIEF**
**Prospective Challenge to Unconstitutionally Vague Standard**
**Threatening Mr. Kline's Application of Reinstatement**

15.1    Plaintiff Phillip D. Kline hereby incorporates paragraphs one through 14.7 as though fully restated here and further states the following.

15.2    If this Court fails to conclude and declare that the suspension of Mr. Kline's law license is void for the grounds set forth in this Complaint, Mr. Kline would intend to re-apply for the reinstatement of his Kansas law license at the earliest possible time, meaning October 2016.

15.3    Kansas Sup. Ct. Rules, Rule 219(b)(3) will require Mr. Kline to "set forth facts establishing that [he] is entitled to be reinstated to the practice of law."  In

the spirit of the post-recusal court's free-wheeling application of the Rule 8.4 "catch-all" rules, Rule 219, as written, can mean anything, provides no standards for Mr. Kline's behavior during the period of suspension, provides no standard for evaluating petitions for readmission, and therefore leaves decision-makers with unbridled discretion to grant or deny Mr. Kline's (or anyone's) petition for arbitrary reasons.

15.4    Consequently, Rule 219 may be used to deny Mr. Kline's petition for readmission based upon his criticism of those whom he believes, for political and ideological reasons, wrongfully suspended his law license, criticisms contained in pleadings and papers he filed in connection with his prior the disciplinary proceeding, or pleadings and papers that he files in this federal action.

15.5    The lack of fair notice and discernible standards governing Mr. Kline's petition for readmission under Kansas Supreme Court Rule 219, and the chilling threat of retaliation that hangs over Mr. Kline for any exercise of his rights of free speech and petition, deprive Mr. Kline of his rights under the First and Fourteenth Amendments to the U.S. Constitution, all of which give rise to claims for declaratory and/or injunctive relief under 42 U.S.C. §1983.

**WHEREFORE**, Plaintiff Phillip D. Kline prays for the following relief:

A.    A Declaratory Judgment that the composition of the post-recusal court, consisting of only two Kansas Supreme Court justices and five replacement judges from the lower courts of Kansas, was an improperly constituted tribunal under the Kansas Constitution and that the "judgment" of the post-recusal court purporting to suspend Mr. Kline's law license is therefore a void

judgment under Kansas law (an issue that the Kansas Supreme Court has not addressed and cannot address);

B.  A Declaratory Judgment that the composition of the post-recusal court and the void judgment that resulted therefrom had no effect on the validity of Mr. Kline's Kansas law license, and to the extent that the action of the post-recusal court could be construed as having suspended Mr. Kline's law license, it constituted a deprivation of a property interest without due process of law in violation of the Due Process Clause of the 5th and 14th Amendments to the United States Constitution, was void *ab initio*, and is unenforceable;

C.  A Declaratory Judgment that the appointments made by Defendant Justice Biles of three district court judges and two appellate court judges to sit temporarily on the Kansas Supreme Court for the Kline case were invalid appointments under the Kansas Constitution, that the post-recusal court was therefore an improperly constituted court, that the "judgment" of the post-recusal court purporting to suspend Mr. Kline's law license violated Mr. Kline's rights under the Due Process Clause of the 5th and 14th amendments to the United States Constitution because of its illegitimate composition, and that the "judgment" was therefore void ab initio and is unenforceable;

D.  A Declaratory Judgment that the refusal of Defendant Carol Green to accept for filing Mr. Kline's motion to vacate the void judgment and other motions raising due process violations violated Mr. Kline's right to be heard under the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution;

E.  A Declaratory Judgment that all of the other KRPC violations found by the post-recusal court, individually and collectively, constituted arbitrary and capricious conduct by the judicial branch of government, lacking any standards or precedent, and contrary to the objective fact record, all in violation of the Due Process Clause of the 5th and 14th Amendments to the United States Constitution;

F.  A Declaratory Judgment that there were sufficient defects in Mr. Kline's disciplinary process, including but not limited to the lack of a probable cause finding, panel bias, the unreasonably low page limitation for appeal briefs in a case of this nature, and other procedural irregularities, that Mr. Kline was not

afforded a hearing in a meaningful manner prior to the alleged suspension of his Kansas law license, all in violation of the Due Process Clause of the 5th and 14th Amendments to the United States Constitution;

G.  A Declaratory Judgment that the disciplinary charges against and harsh punishment of Mr. Kline, in contrast to the lack of any adverse action taken against other Kansas attorneys as described in the Seventh Claim for Relief, lacked any rational basis and constituted forbidden discrimination against Mr. Kline in violation of his right to Equal Protection under the Fourteenth Amendment to the United States Constitution;

H.  A Declaratory Judgment that the Kansas Supreme Court justices' multiple roles as (i) fact complainant, (ii) governing authority over the prosecutor, (iii) ultimate authority over the Kansas Disciplinary process and personnel, and (iv) judicial decision-maker with no right of Mr. Kline to appeal, constitutes an irreconcilable and fatal conflict of interest in violation of Kline's Due Process rights, thereby rendering the Decision/Judgment void and barring any future proceedings against Mr. Kline for the alleged KRPC violations found by the Hearing Panel;

I.  A Declaratory Judgment that, even if the Decision/Judgment of the post-recusal court act is otherwise permitted to stand, the post-recusal court improperly violated Mr. Kline's rights by enhancing his sanction because he held fervid beliefs, and for doing so without notice that his beliefs were an issue in the case, all a violation of Mr. Kline's rights under the Equal Protection Clause of the 14th Amendment to the United States Constitution;

J.  A Declaratory Judgment that Kansas Rule 219(b)(3) governing Mr. Kline's petition for readmission violates Mr. Kline's First Amendment (free speech and petition) and Fourteenth Amendment (due process) rights, and cannot be used to deny Mr. Kline's petition for readmission.

K.  If necessary, Preliminary and Permanent Injunctive Relief to enforce and give effect to this Court's Declaratory Judgment(s), and specifically requiring the Defendants to enter an immediate order vacating the post-recusal court's October 18, 2013 decision/judgment purporting to suspend Mr. Kline's law license, and stating that Mr. Kline's law license has not been suspended;

L.    Reasonable attorney fees and costs under 42 U.S.C. Section 1988;

M.    Any such other relief, both legal and equitable, to which they may be entitled.

Respectfully submitted,


 /s/ Richard J. Peckham_____          _/s/ Thomas W. Condit_____
Richard J. Peckham                      Thomas W. Condit
Kansas Bar No. 10480                    Ohio Bar No. 0041299
105 E. Rhondda Avenue                   P.O. Box 12700
Andover, KS 67002-9635                  Cincinnati, Ohio 45212
Tel:  (316) 733-0066                    Tel:  (513) 731-1230
Fax:  (316) 733-2550                    Fax:  (513) 731-7230
Cell   (316) 648-1359                   Cell:  (513) 284-9260
peckhamrj@aol.com                        twcondit@fuse.net
Lead Attorney For Plaintiff             Co-counsel For Plaintiff
                                         (Motion For Admission Pro Hac Vice
                                          Being Filed)





**State of Kansas**

## Office of Judicial Administration
**Kansas Judicial Center**
301 SW 10th
Topeka, Kansas 66612-1507

(785) 296-2256

For More Information,
Contact Ron Keefover
Education-Information Officer

FOR IMMEDIATE RELEASE:                               May 18, 2012

Today five of the seven justices of the Kansas Supreme Court voluntarily recused themselves from hearing a pending disciplinary case against former Attorney General and Johnson County District Attorney Phill Kline.

The justices cited the Kansas Code of Judicial Conduct, Rule 2.11, which requires recusal when a judge "previously presided as a judge over the matter in another court."

The Supreme Court ordinarily reviews the decisions of lower courts and government agencies. When the behavior or statements of a lawyer appearing in these or other settings ultimately become the subject of a disciplinary panel's scrutiny, the Supreme Court can review the panel's fact findings and conclusions of law and any disciplinary recommendation without any direct knowledge of the behavior or statements.

This would not be possible for the five justices who recused today in Mr. Kline's case. Certain of Mr. Kline's alleged violations of ethics rules occurred either in the justices' presence during an oral argument or in other proceedings that bypassed the lower courts and were filed directly with the Supreme Court.

These earlier cases included, on more than one occasion, claims that the Supreme Court should hold Mr. Kline in contempt of court.  And three or more of the five justices, depending on the time period in which the claims arose, evaluated and disposed of the claims. In some instances, those evaluations plus the justices' observations of Mr. Kline's conduct in the cases and a related criminal matter compelled the Supreme Court to make referrals to the Disciplinary Administrator.

The five justices decided that the earlier performance of their required role as first fact finders on Mr. Kline's behavior and statements prevented exercise of their later role as last reviewers of some of the same behavior and statements underlying the pending disciplinary case.

Justices Dan Biles and Nancy Moritz were not involved in any of the earlier cases involving Mr. Kline and will therefore continue to sit on his disciplinary case. Justice Biles will be the Presiding Justice. He and Justice Moritz will be joined by five other Kansas judges as the disciplinary case moves forward to final decision.

# # #



**IN THE SUPREME COURT OF THE STATE OF KANSAS**

Case No. 106,870

In the Matter of Phillip Dean Kline,
*Respondent.*

**ORDER**

The following Justices of the Kansas Supreme Court have recused, effective May 18, 2012, from further consideration of the above-captioned original proceeding in discipline:  Chief Justice Lawton Nuss, Justice Marla Luckert, Justice Carol Beier, Justice Eric Rosen, and Justice Lee Johnson.

DATED:  May 23, 2012.

FOR THE COURT:

Dan Biles, Presiding Justice

## IN THE SUPREME COURT OF THE STATE OF KANSAS

> FILED
>
> JUN 4 2012
>
> CAROL G. GREEN
> CLERK OF APPELLATE COURTS

## ORDER

Pursuant to the authority vested in the Supreme Court by Article 3, Section 6(f) of the Kansas Constitution and K.S.A. 20-3002(c), the following judges are hereby assigned to serve temporarily on the Supreme Court to participate in the hearing and decision of Case No. 106,870, *In the Matter of Phillip Dean Kline*:

Honorable Henry W. Green, Jr (Judge, Kansas Court of Appeals)

Honorable Karen M. Arnold-Burger (Judge, Kansas Court of Appeals)

Honorable Edward E. Bouker (Chief Judge, 23rd Judicial District)

Honorable Bruce T. Gatterman (Chief Judge, 24th Judicial District

Honorable Michael J. Malone (Judge, 7th Judicial District)

DATED:  June 4, 2012.

FOR THE COURT:

Dan Biles, Presiding Justice

EXHIBIT

3



## *The Appellate Courts of Kansas*

KANSAS JUDICIAL CENTER
301 S.W. 10th Ave.
Topeka, Kansas 66612-1507

Carol Gilliam Green, *Clerk*
Jason P. Oldham
*Chief Deputy Clerk*

Area Code 785
Telephone 296-3229
Fax 296-1028

February 27, 2014

Kyle E. Krull
5209 W 164th St
Overland Park, KS 66085

Mr. Krull:

Earlier this week our office received your motion to vacate and dismiss concerning Appeal No. 106,870.

The December 10, 2013, order denying the motion for rehearing or modification closed this matter. Nothing more can be filed.

Find your pleadings enclosed.

Sincerely,

Carol G. Green
Clerk of the Appellate Courts

EXHIBIT

4

EXHIBIT

tabbies®

5

# Thomas W. Condit

### Attorney At Law
P.O. Box 12700
**Cincinnati, Ohio 45212**

Phone (513) 731-1230

Fax (513) 731-7230

March 7, 2014

Carol Green
Clerk of the Appellate Courts
Kansas Judicial Center
301 SW 10th Ave., Room 374
Topeka, KA  66612-1507

**VIA FAX AND U.S. MAIL**
(785) 296-1028

*In Re Kline*
*Supreme Court No. 11-106870*

Dear Ms. Green,

As you know, I represent former Kansas Attorney General Phillip D. Kline in the captioned disciplinary case that was decided by the post-recusal court in an Opinion issued on October 18, 2013.  On behalf of Mr. Kline, we filed the *Motion of Respondent Phillip D. Kline For Rehearing or Modification* on December 2, 2013, which the post-recusal Court denied without comment on December 10, 2013.

On February 25, 2014, I filed *Respondent Phillip D. Kline's Motion to Vacate and Dismiss Void Judgment,* a motion that, I humbly submit, raised serious issues requiring review.  To my surprise, I was informed less than a week later by Attorney Kyle Krull that he had received back from the Court all nine copies of the motion along with your attached letter dated February 27, 2014 stating that "Nothing more can be filed."

I am writing this letter because I was very close to filing a second Motion to Vacate addressing the multiple due process issues that are documented in this case but which the Court's briefing limitations prevented us from raising during the pendency of the appeal.  Again, this next motion will be directed not just at the idea that the court has erred, but that the judgment is void.  I do not want to waive any of Mr. Kline's rights by failing to raise these important issues with the Court, but on the other hand I do not want another filing to be viewed as disrespectful to the Court in light of the unambiguous bar to any more filings as expressed in your February 27 letter.

My question is therefore simple:  If Mr. Krull and I deliver another motion to vacate to the Clerk's office for filing next week, will it be accepted by the Court or will you return it again to Mr. Krull without any consideration by the Court?  I will be governed accordingly.

Thank you for your attention to this matter.

Sincerely,

Thomas W. Condit

TWC/kc

Copy:  Stanton A. Hazlett
       Disciplinary Administrator



EXHIBIT
6



CAROL GILLIAM GREEN
*Clerk*

# The Appellate Courts
# of Kansas

KANSAS JUDICIAL CENTER
301 S.W. 10TH AVENUE
TOPEKA, KANSAS 66612-1507

AREA CODE 785
TELEPHONE 296-3229
FAX 296-1028

7 March 2014

Thomas W. Condit
P.O. Box 12700
Cincinnati, Ohio 45212

Dear Mr. Condit,

Because Case No. 106,870, *In Re: Kline*, is a closed case, the appellate clerk's office is unable to accept further filings. Thank you for inquiring before delivering any further motions to this office.

Cordially,

*Carol G. Green*

Carol G. Green

cc.   Stanton A. Hazlett, Disciplinary Administrator



RECEIVED

MAR 1 0 2014

BY: